**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| Nia Green, Lauren Szymula, and Ariana King, individually and as the representative of a class of similarly situated persons, and on behalf of the Health Care Plans for Faculty & Staff of the University of Rochester,<br><br>Plaintiffs,<br>v.<br><br>University of Rochester,<br><br>Defendant. | Case No. 6:25-cv-06499-EAW<br><br>**AMENDED COMPLAINT**<br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1. Plaintiffs Nia Green, Lauren Szymula, and Ariana King ("Plaintiffs"), as representatives of the class defined herein, and on behalf of the Health Care Plans for Faculty & Staff of the University of Rochester (the "Plan"), bring this action under the Employee Retirement Income Security Act ("ERISA") against University of Rochester ("Defendant"). As described herein, Defendant has breached its fiduciary duties under ERISA by (1) failing to prudently select and monitor the Plan's preferred provider organization ("PPO") medical insurance options, allowing the low-deductible option to be financially dominated by the high-deductible option; and (2) failing to disclose this material information to the Plan's participants. Defendant's actions and omissions have caused millions of dollars in losses to the proposed class. Plaintiffs bring this action to recover these losses, prevent further similar conduct, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      As of 2023, 53.7% of civilian Americans relied upon their employer or union for health insurance coverage.[1] This employment-based coverage is by far the most common type of health insurance coverage in the United States,[2] and along with retirement benefits, make up 13% of total national compensation.[3] Americans also devote a substantial percentage of their annual expenditures to healthcare. In 2023, healthcare accounted for 8% of all consumer expenditures.[4] As such, it is crucial that each health insurance option offered by employers do not needlessly waste participants' money. As numerous courts have held, "'[w]asting beneficiaries' money is imprudent.'" *Johnson v. Parker-Hannifin Corporation*, 122 F.4th 205, 223 (6th Cir. 2024) (quoting *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016)).

3.      To this end, employers must confirm that no health insurance option is financially dominated by another. In economic terms, an option is dominated when it provides the same financial value to a consumer yet costs more than an alternative. A health insurance option is financially dominated when there is another option that results in lower total out-of-pocket expenses to participants, inclusive of premiums and regardless of the amount of medical care received.[5] In essence, the dominated option costs more but provides no additional benefit that could justify the increased cost. It is a waste of participants' money.

---

[1] https://www2.census.gov/library/publications/2024/demo/p60-284.pdf.
[2] *Id.*
[3] Monahan, Amy and Richman, Barak D., Hiding in Plain Sight: ERISA's Cure for the $1.4 Trillion Health Benefits Market (2025). Yale Journal on Regulation, Volume 42, No.1, Pp. 234-290, at 237 n.1; *see also id.* at 263-264 (the full cost of employer sponsored health insurance is a compensation expense that reduces wages accordingly).
[4] https://www.bls.gov/news.release/pdf/cesan.pdf.
[5] *See* Choose to Lose: Health Plan Choices from Menu with Dominated Options, at 1321.

4.      In managing the Plan, Defendant has assembled a menu of Preferred Provider Organization ("PPO") options in which the low-deductible option is financially dominated by the high-deductible option while providing the same health benefits from the same provider network, in breach of its fiduciary duty of prudence. In addition, Defendant is responsible for knowing about the dominated nature of the low-deductible option but has failed to communicate this material information to the Plan's participants, in breach of its fiduciary duty.

5.      To purportedly accommodate the varying needs of their employees, Defendant offers a high deductible ("YOUR HSA-Eligible") and a low deductible ("YOUR PPO") option. The only difference in these options is cost. The options vary in cost-sharing features such as monthly premiums, deductibles, coinsurance, and out-of-pocket maximums. For example, the YOUR PPO option is accompanied by higher premiums in exchange for a lower annual deductible, while the YOUR HSA-Eligible option offers lower premiums but higher annual deductibles. Each option provides access to the same healthcare services from the same PPO network.

6.      There is nothing inherently wrong with offering a low-deductible and high-deductible option. Many plans do just that. A prudently managed health plan may offer a high-deductible option (with a lower premium) that is less expensive than a low-deductible option (with a higher premium) at low levels of medical spend; but the high-deductible option comes with a higher deductible and higher out-of-pocket maximums, causing it to be more expensive than the low-deductible option after the employee incurs a moderate level of medical bills. This financial trade-off based on the level of medical spending a participant incurs is precisely what various cost-sharing options are supposed to offer. Participants thus have a choice of which option better suits their needs based on their personal circumstances and anticipated level of medical spending.

7.      Instead of offering a low-deductible and high-deductible option that provide a financial trade-off based on different levels of medical spending, Defendant offers a low-deductible (YOUR PPO) option that provides **significantly higher** out-of-pocket expenses **for nearly all levels of medical spending**.[6] Put simply, regardless of the amount and type of medical care that a participant receives, the participant will almost certainly pay significantly more money for the same medical services when enrolled in the YOUR PPO option. This means that the YOUR HSA-Eligible option financially dominates the YOUR PPO option. Defendant offers the guise of choice, but there is no economically rational reason to choose the YOUR PPO option. This defeats the purpose of offering a low-deductible and high-deductible option.

8.      The amount that a participant overspends in the YOUR PPO option is significant. For example, a participant enrolled in family coverage seeking care from the Tier I network will pay roughly **$10,000 or more per year** for the exact same care in the YOUR PPO option compared to the YOUR HSA-Eligible option, regardless of the medical care that they and their family receive:[7]

---

[6] The few exceptions are extreme scenarios, as described below, that are highly unlikely to occur, impossible to anticipate, and provide a minimal amount of savings in the unlikely event that they do occur.

[7] This chart assumes that a participant enrolled in family coverage meets the embedded individual deductible and out-of-pocket maximum and all other family members incur no medical expenses. Any additional spending for other family members would lead to an even **greater** difference between the cost of the YOUR PPO and YOUR HSA-Eligible option.



9.      Defendant's management of the Plan's PPO options is subject to ERISA's strict

fiduciary duties. 29 U.S.C. § 1104(a)(1). These duties are "'the highest known to the law.'"

*LaScala v. Scrufari,* 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan v. Bierwirth*, 680 F.2d

263, 272 n.8 (2d Cir. 1982)). Fiduciaries must act with the "care, skill, prudence, and diligence"

that a "prudent [person] acting in a like capacity and familiar with such matters would use in the

conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B), and

"solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A). Defendant

has breached its fiduciary duty of prudence by assembling a menu of options where there is *no*

financial or medical benefit to selecting the YOUR PPO option under any realistic scenario of

health-care spending. In doing so, Defendant has failed to ensure that the fees charged are

reasonable in light of the services offered.

10.     Discovering the dominated nature of these options requires a complicated

mathematical computation beyond the skills of a layperson, which is why ERISA's duty of

prudence "does not require merely the level of care expected of a prudent layperson, but rather

5

that of a prudent fiduciary with experience dealing with a similar enterprise.*" In re Meridian Funds Group Securities and ERISA Litig.*, 917 F.Supp.2d 231, 239 (S.D.N.Y. 2013) (citing *United States v. Mason Tenders Dist. Council of Greater New York*, 909 F.Supp. 882, 886 (S.D.N.Y. 1995)). By offering a financially dominated option like the YOUR PPO option, Defendant imprudently shifted the burden to determine the dominated nature of the options from the employer to participants.

11.     The consequences of this shift are material. In a 2017 study, researchers found that 61% of employees selected a financially dominated option when one existed.[8] The reason that more than half of employees select a financially dominated option when available is simple: a lack of understanding of health insurance among the general public.

12.     Indeed, the idea that individuals knowingly enroll in a financially dominated option to achieve lower deductibles has been debunked. When the consequences of selecting a financially dominated option were shared with participants, researchers found this reduced the share of subjects choosing a dominated option to 18%.[9] When the focus was placed upon the enrollment decisions of individuals deemed to have a high understanding of insurance, it was found that less than 2% chose a dominated option.[10] In other words, "the choice of dominated plans cannot be rationalized by standard risk preference or any expectations about health risk."[11] The complicated nature of health insurance and the likelihood that participants will not be able to identify when a dominated option is offered to them underscores the importance of offering prudent, non-dominated health insurance options to participants, and of disclosing the dominated nature of an option if one is inadvertently offered. Defendant has failed to do either.

---

[8] Choose to Lose: Health Plan Choices from Menu with Dominated Options, at 1321.
[9] *Id.* at 1325.
[10] *Id.*
[11] *Id.* at 1319.

13.    Defendant's decision to offer the financially dominated YOUR PPO option without appropriately evaluating and monitoring the fees associated with that option, failure to monitor and correct their imprudent offering of a dominated option, and the failure to disclose the dominated nature of the YOUR PPO option to participants has resulted in the Plan and its participants paying wholly excessive and unnecessary healthcare expenses in the form of lost wages due to excessive premiums unaccompanied by any reduced out-of-pocket expenses or superior healthcare services.

14.    Based on this conduct, Plaintiffs assert claims against Defendant for breaches of the fiduciary duties of prudence and loyalty. Plaintiffs also assert a claim against Defendant for its failure to monitor the fiduciaries it appointed to manage the Plan.

## JURISDICTION AND VENUE

15.    Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employer-sponsored health insurance plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

16.    This case presents a federal question under ERISA, and therefore the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

17.    Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendant may be found.

## THE PARTIES

*Plaintiffs*

18.    Plaintiff Nia Green participated in the Health Care Plans for Faculty & Staff of the

University of Rochester from approximately 2021-2025 and is a former participant in the Plan. During Plaintiff's time in the Plan, she was enrolled in the YOUR PPO option at the individual coverage level from 2024-2025. Plaintiff has been financially injured by Defendant's unlawful conduct, and her compensation would have been higher if Defendant had not violated ERISA as described herein.

19.    Plaintiff Lauren Szymula participated in the Health Care Plans for Faculty & Staff of the University of Rochester from 2018-2022 and again beginning in 2024. She is a current participant in the Plan. During Plaintiff's time in the Plan, she was enrolled in the YOUR PPO option at the individual coverage level in 2024. Plaintiff has been financially injured by Defendant's unlawful conduct, and her compensation would have been higher if Defendant had not violated ERISA as described herein.

20.    Plaintiff Ariana King participated in the Health Care Plans for Faculty & Staff of the University of Rochester from approximately 2016 through 2022 and is a former participant in the Plan. During Plaintiff's time in the Plan, she was enrolled in the YOUR PPO option at the individual coverage level from 2018-2022. Plaintiff has been financially injured by Defendant's unlawful conduct, and her compensation would have been higher if Defendant had not violated ERISA as described herein.

***Defendant***

21.    Defendant University of Rochester is a private research university located in Rochester, New York.

22.    Defendant is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). Defendant has named the Vice President and Chief Human Resources Officer (the "Vice President") as the "administrator" of the Plan within the meaning of 29 U.S.C. § 1002(16)(A). As

the administrator of the Plan, the Vice President exercises discretionary authority or control with respect to the administration of the Plan and management and disposition of Plan assets. The Vice President is therefore a functional fiduciary under 29 U.S.C. § 1002(21)(A).

23.    Defendant may delegate its fiduciary responsibilities to any other person, persons, or entity. Any individuals or entities not named in this Complaint to whom Defendant delegated fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2).

### *Health Care Plans for Faculty and Staff of the University of Rochester*

24.    The Plan was established July 1, 1956, and provides certain welfare and other benefits for eligible personnel and retirees of the University as part of their overall compensation. Included within these benefits are health insurance, vision benefits, prescription drug benefits, condition management programs, and lifestyle management programs.

25.    For their health insurance, participants' expenses are primarily determined by each plan's deductible, coinsurance rates, copayments, out-of-pocket maximum ("OOPM"), and premiums. A deductible is the amount that a participant must pay for covered services before insurance begins to contribute. Once a participant reaches the deductible, the coinsurance rate is the percentage of expenses for covered services that the participant pays compared to the percentage that insurance pays. A copayment is a fixed amount that a participant pays for a particular service. The OOPM is the annual cap that a participant is allowed to pay for covered services. If a participant reaches the OOPM for a given year, insurance pays 100% of any additional covered cost for the remainder of the year. The deductible and OOPM both reset annually.

9

26.     Additionally, participants pay premiums regardless of whether they incur any covered expenses. Premiums are deducted from participants' paychecks on either a bi-weekly, semi-monthly, or monthly basis, in accordance with the frequency of a participant's paycheck.

27.     All of these cost-sharing features may vary based on (1) whether the participant selects Employee, Employee and Spouse/Domestic Partner, Employee and Child(ren), or Family coverage; (2) an employee's salary-level; and (3) whether medical services incurred are in- or out-of-network (Tier 1, Tier 2, or Tier 3).

28.     Defendant offers participants two health insurance options: the YOUR PPO option and the YOUR HSA-Eligible option. If participants elect coverage through the YOUR HSA-Eligible option, they may choose to open and contribute to a Health Savings Account ("HSA"), a tax-savings vehicle which may be used to pay the cost of qualified healthcare expenses as defined by the Internal Revenue Service. Any balance remaining in a participant's HSA at the end of the year may be rolled over for use in the future. Participants enrolled in the YOUR PPO option are ineligible for an HSA but may participate in an FSA. Participants enrolled in the YOUR HSA-Eligible option may also choose to participate in an FSA instead of an HSA. Defendant contributes to the HSA on behalf of participants, but does not contribute to the FSA.[12]

29.     Critically, there is no difference in health care coverage or quality for participants in the YOUR PPO and YOUR HSA-Eligible options. The only differences between the PPO options are the financial terms: premium amounts, deductibles, coinsurance rates, copayments, maximum out-of-pocket expenses, and eligibility for a HSA or Flexible Spending Account ("FSA"). Participants in both options may choose to receive care from any licensed doctor,

---

[12] YOUR HSA-Eligible participants also may choose to have both an HSA and a Limited Purpose FSA.

hospital, or facility. Similarly, participants in both options have access to the same prescription drugs covered under the Plan.

30.     For example, both the YOUR PPO and YOUR HSA-Eligible options offer mental health services through Behavioral Health Partners ("BHP"). According to the University's website, BHP provides short-term mental health services to covered adults for a small number of mental health conditions, but does not provide any services to children. These services are not meant to replace primary care for individuals with mental health conditions. The YOUR PPO option covers 100% of services provided by BHP before meeting the deductible, and the YOUR HSA-Eligible option covers 100% of the same services after meeting the deductible. This cost-sharing distinction applies *only* to the limited scope of mental health services provided by BHP, which is a Tier 1 provider. It does not apply to mental health services from any other provider or the cost of any prescriptions associated with mental health conditions.

31.     For both options, participants will incur the lowest out-of-pocket expenses for "Tier 1" services (that is, services performed by members of the Plan's Accountable Health Partners Network). Participants incur the next lowest out-of-pocket costs for "Tier 2" services (that is, services performed by members of the Plan's Excellus Blue Cross Blue Shield National Network). Finally, participants incur the highest out-of-pocket costs for "Tier 3" or "Out-of-Network" services, which are services performed by providers that are not part of the Tier 1 or Tier 2 networks.

32.     Regardless of which option is selected, participants may choose between Single, Employee and Spouse/Domestic Partner, Employee and Child(ren), or Family coverage tiers depending on the desired number of insured individuals. The premiums paid by a participant are

11

based on the coverage-tier selected, employment status (whether the individual is full-time or part-time), and salary.

33.    The Plan is self-insured. This means it is funded by both employee and employer contributions that are deposited within a trust, pays claims and other expenses from the trust, and is exempt from state insurance regulations.

## ERISA'S FIDUCIARY DUTIES

34.    "ERISA protects employee pensions and other benefits . . . by setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefit plans." *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (citation omitted). In the ERISA context, the term "plan" means "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both[.]" 29 U.S.C. § 1002(3). An employee welfare benefit plan includes "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits[.]" 29 U.S.C. § 1002(1). To protect participants of employee benefit welfare plans like the Plan, 29 U.S.C. § 1104(a)(1) states, in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan …

    (A)    for the exclusive purpose of

        (i)    providing benefits to participants and their beneficiaries; and

        . . . .

    (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

These fiduciary duties are "'the highest known to the law.'" *LaScala,* 479 F.3d at 219 (quoting

*Donovan*, 680 F.2d at 272 n.8).

## DUTY OF LOYALTY

35.    "The duty of loyalty is one of the common law trust principles that apply to ERISA fiduciaries, and it encompasses a duty to disclose." *King v. Blue Cross & Blue Shield of Illinois*, 871 F.3d 730, 744 (9th Cir. 2017). Indeed, "[t]he duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466 (7th Cir. 2010) (citation omitted). This includes "an obligation to provide full and accurate information to the plan beneficiaries regarding the administration of the plan." *Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76, 89 (2d. Cir. 2001) (citation omitted). Fiduciaries' duty to communicate material facts to participants "exists when a beneficiary asks fiduciaries for information, and even when he or she does not." *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993) (citation omitted).

36.    "'[W]hen a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty[.]'" *Devlin*, 274 F.3d at 88 (quoting *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 57 F.3d 1255, 1264 (3d Cir. 1995)). A fiduciary must inform participants "when it knows that silence may be harmful and cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits." *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007); *see also* Restatement (Third) of Trusts § 82 cmt. d (outlining "an affirmative requirement that . . . the trustee inform fairly representative beneficiaries of important developments and information that

13

appear reasonably necessary for the beneficiaries to be aware of in order to protect their interests.").

37.     This general fiduciary duty to disclose material information is supplemented by a specific statutory obligation to provide information in a form "sufficiently accurate and comprehensive to reasonably apprise [] participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a).

### DUTY OF PRUDENCE

38.     "If there is . . . a 'hallmark' of a fiduciary activity identified in the statute, it is prudence." *Sweda v. Univ. of Penn.*, 923 F.3d 320, 333 (3d Cir. 2019). This is not a lay person standard, but instead "requires expertise in a variety of areas[.]" Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (Sept. 2017).[13] This duty applies to all ERISA-covered plans. *See Varity Corp.*, 516 U.S. at 596. Indeed, "the fiduciary duty provisions of ERISA . . . apply with equal force to welfare and pension plans." *Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996). Thus, the duty of prudence includes "a continuing duty to monitor [benefit options] and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting [benefit options]." *Tibble v. Edison Intern.*, 575 U.S. 523, 529 (2015). If a benefit option is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* at 530 (quotation omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu" of benefit options or for failing to monitor the plan's benefit options to ensure that each remains prudent. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007).

---

[13] *Available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/meeting-your-fiduciary-responsibilities.pdf.

39.     Similarly, a fiduciary also "must ensure that th[e] fees and expenses" charged to participants "are reasonable, necessary for the plan's operation, and not excessive for the services provided."[14] As numerous courts have held, a fiduciary "'[w]asting beneficiaries' money is imprudent.'" *Johnson,* 122 F.4th at 223 (quoting *Tibble*, 843 F.3d at 1198).

40.     It is no defense to the imprudence of some benefit options that others may have been prudent; a meaningful mix and range of options does not insulate plan fiduciaries from liability of breach of fiduciary duty. *See Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022) (*"Hughes I"*). "[A] pleading need not show that a prudent alternative was actually available; showing that an alternative prudential option was plausibly available sufficed." *Acosta v. Bd. of Trustees of Unite Here Health*, 2023 WL 2744556, at *4 (N.D. Ill. Mar. 31, 2023) (citing *Hughes v. Nw. Univ.*, 63 F.4th 615, 629-30 (7th Cir. 2023) (*"Hughes II"*)).

### FIDUCIARY VS. SETTLOR FUNCTIONS

41.     Whether these duties apply to the actions of the Plan sponsor and the Plan's fiduciaries hinges upon the distinction between fiduciary and settlor functions. Generally, the decision to adopt, modify, or terminate a welfare plan is a settlor decision outside the bounds of ERISA. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 79 (1995).

42.     However, activities undertaken to implement settlor decisions are fiduciary functions subject to ERISA. 29 U.S.C. § 1002(21)(A)(i), (iii) (ERISA defines a fiduciary as any person "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or

---

[14] Dep't of Labor, *Understanding Your Fiduciary Responsibilities Under a Group Health Plan* (Sept. 2023).

disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."); *see also* DOL Adv. Opinion No. 2001-01A, 2001 WL 125092, at *2 (Jan. 18, 2001) (finding that the implementation of a settlor decision is a fiduciary activity). Indeed, "[m]ost employers who sponsor fully or partially self-funded group health plans" like the Plan "exercise some discretionary authority and therefore are fiduciaries."[15] Thus, although the decision to offer health insurance to plan participants may be a settlor decision, an employer's decision as to *which* specific health insurance options to offer is subject to ERISA's fiduciary duties as an implementation of a settlor decision.

43.    Likewise, fiduciaries have a duty to monitor any settlor decisions to ensure they remain in the best interests of Plan participants. A fiduciary also "must ensure that th[e] fees and expenses" charged to participants "are reasonable, necessary for the plan's operation, and not excessive for the services provided."[16] "After carefully evaluating [fees] when selecting a service provider, the plan's fees and expenses should be monitored to determine whether they are still reasonable."[17]

<u>**DEFENDANT'S VIOLATIONS OF ERISA**</u>

**I.    DEFENDANT BREACHED ITS FIDUCIARY DUTIES IN MANAGING THE PLAN**

44.    As a fiduciary, Defendant is required to ensure that costs incurred by participants are reasonable. *See Sweda*, 923 F.3d at 328 ("Fiduciaries must . . . understand and monitor plan expenses."); *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (discussing a fiduciary's duty to keep plan expenses under control); *see also* Restatement (Third) of Trusts §

---

[15] Dep't of Labor, *Understanding Your Fiduciary Responsibilities Under a Group Health Plan* (Sept. 2023).
[16] *Id.*
[17] *Id*.

90, cmt. A ("Implicit in a trustee's fiduciary duties is a duty to be cost-conscious."). When selecting health insurance options for participants, "the responsible plan fiduciary must engage in an objective process designed to elicit information necessary to assess . . . the reasonableness of the fees charged in light of the services provided." DOL Info. Letter from Bette J. Briggs to Diana O. Ceresi, 1998 WL 1638068, at *1 (Feb. 19, 1998).

45.     Defendant is additionally duty bound to disclose material information to Plan participants. This includes "an obligation to provide full and accurate information to the plan beneficiaries regarding the administration of the plan." *Devlin*, 274 F.3d at 89 (citation omitted). "Information is material if there is a substantial likelihood that nondisclosure 'would mislead a reasonable employee in the process of making an adequately informed decision regarding benefits to which she might be entitled.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 599 (8th Cir. 2009) (quoting *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007)). "[M]ateriality turns on the effect information would have on a reasonable participant's decisions" about their healthcare options. *Id.* (citing *Edgar v. Avaya, Inc.*, 503 F.3d 340, 350 (3d Cir. 2007) (abrogated on other grounds)).

46.     Despite these duties, Defendant failed to undertake the requisite prudent process in assessing the fees charged to participants within the YOUR PPO option in light of the services provided. Instead, the more costly YOUR PPO option offered to participants gives them access to the same suite of medical services with *no* financial or medical benefit when compared to the YOUR HSA-Eligible option under any realistic scenario of health-care spending. This is true regardless of a participant's coverage level (i.e., single, employee and spouse/domestic partner, employee and child(ren), or family), salary level, and amount and quality of medical services received.

47.    To illustrate, for individuals selecting "Single" coverage through the YOUR PPO option, annual premiums range from $1,843 to $6,255 depending on their salary, while their Tier 1 deductible is $500 with an out-of-pocket maximum of $2,000 or $2,750.[18] In contrast, individuals selecting "Single" coverage instead through the YOUR HSA-Eligible option would incur annual premiums between $189 and $2,314 while their Tier 1 deductible is $1,650 with an out-of-pocket maximum of $2,500 or $3,000. In other words, an individual enrolled in the YOUR PPO option will pay between $1,654 and $3,941 *more* in premium payments than if they had enrolled in the YOUR HSA-Eligible option, while reducing their total out-of-pocket max by only $250 to 300. The YOUR PPO premiums exceed the reduction in out-of-pocket maximum for all salary and coverage levels, as summarized in the following table:

| Differences in YOUR PPO (Low Deductible) & YOUR HSA-Eligible (High Deductible) Premiums and Out of Pocket Maximums | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Coverage Level[19] | Difference in LD vs. HD Annual Premium – Low Salary | Difference in LD vs. HD Annual Premium – Mid Salary | Difference in LD vs. HD Annual Premium – High Salary | Difference in LD vs. HD Out-of-Pocket Max – Low Salary | Difference in LD vs. HD Out-of-Pocket Max – Mid/High Salary | Excessive Payment Per LD Participant at Out-of-Pocket Max – Low Salary | Excessive Payment Per LD Participant at Out-of-Pocket Max – Mid Salary | Excessive Payment Per LD Participant at Out-of-Pocket Max – High Salary |
| Single | $1,654 | $3,198 | $3,941 | -$500 | -$250 | $1,154 | $2,948 | $3,691 |
| Employee + Spouse | $3,907 | $7,544 | $9,308 | -$1,000 | -$500 | $2,907 | $7,054 | $8,808 |
| Employee + Child(ren) | $2,977 | $5,757 | $7,095 | -$1,000 | -$500 | $1,977 | $5,257 | $6,595 |
| Family | $5,328 | $10,300 | $12,693 | -$1,000 | -$500 | $4,328 | $9,800 | $12,193 |

---

[18] The out-of-pocket maximum varies for employees based on salary and employment status. There is a lower out-of-pocket maximum for full-time employees earning less than $71,000/year and Strong Memorial Hospital (SMH) fellows or residents. There is a higher out-of-pocket maximum for full-time employees earning more than $71,000/year and part-time employees. These factors do not affect the dominated nature of the YOUR PPO option.

[19] Premiums increase within each option as more individuals are covered and as a participant's salary increases.

48.     The financially dominated nature of the YOUR PPO option stems from the varying premiums, deductibles, coinsurance rates, and out-of-pocket maximums between the options. Because of the large differences in premiums and out-of-pocket maximums as outlined above, the differences in the deductibles and out-of-pocket maximums among the two options do not provide the financial trade-off that one would expect from a low-deductible vs. high-deductible option. Defendant has the discretion to alter these cost-sharing structures to ensure that neither option is dominated by the other, but has failed to do so.

49.     The YOUR PPO option is financially dominated by the YOUR HSA-Eligible option at *nearly every level of medical spending* whether the participant seeks care in the Tier 1, Tier 2, or Tier 3 network.[20] For example, a participant who falls in the highest salary bracket, enrolls in Family coverage, and seeks medical care exclusively in the Tier 1 network would spend *roughly $10,000 or more* on their and their family's healthcare by choosing the YOUR PPO option instead of the YOUR HSA-Eligible option. This is true regardless of whether the participant and their family have no medical bills, a moderate amount of medical bills, or reach their out-of-pocket maximum.

50.     The same is true in nearly every scenario. For example, the YOUR PPO option includes an embedded deductible and out-of-pocket maximum for coverage tiers that cover more than one individual. These tiers cap costs on the individual level so that one participant may reach their deductible and/or out-of-pocket maximum while other covered individuals are still required

---

[20] Under only extreme conditions is it possible for the out-of-pocket spend (including premiums) for the YOUR PPO option to exceed that of the YOUR HSA-Eligible option. For example, a participant would have to fall within the low salary premiums, enroll in either the Single or Employee and Child(ren) coverage levels, and *incur out-of-network (Tier 3)* medical expenses that exceed $10,000 (for Single coverage) or $20,000 (for Employee and Child(ren) coverage).

to pay out-of-pocket for their medical care. The chart below accounts for this scenario by assuming that a participant enrolled in family coverage meets the embedded individual deductible and out-of-pocket maximum (and thus causes the Plan to pay 100% of additional costs for that individual in the YOUR PPO option) while all other family members incur $0 in medical expenses. In this unlikely scenario, the participant will *still* overpay by thousands of dollars per year in the YOUR PPO option: [21]



51.    Even accounting for the embedded deductible and out-of-pocket maximum in the YOUR PPO options, it is theoretically possible that a participant could pay less in the YOUR PPO option, but only in extreme, unrealistic scenarios. For example, an employee in the middle salary bracket could break even in the Your PPO option compared to the YOUR HSA-Eligible option if

---

[21] The graph includes premiums, deductibles, coinsurance, and out-of-pocket maximums. It is not possible for the graph to include copays, which depend on the number of office visits. However, including copays would not change the dominated nature of the YOUR PPO option. Likewise, any additional spending would still result in participants significantly overpaying in the YOUR PPO option.

they chose the Employee and Child(ren) option, one family member incurred $18,825 of Tier 3 (out-of-network) medical expenses, and all other family members incurred $0 in medical expenses. It is highly unlikely that this scenario applies to any Plan participants, and if it did, it would be impossible for a participant to anticipate such an extreme scenario in advance. This highly improbable exception proves the rule: for the overwhelming majority—if not all—of the Plan's participants, the YOUR PPO option simply wastes their money. Prudent fiduciaries do not offer dominated options that may theoretically provide a small amount of savings in extremely unlikely scenarios when other options provide the same medical care for thousands of dollars less in nearly all, if not all, scenarios.

52.    As a fiduciary, Defendant was responsible for selecting and negotiating health plan options with its PPO provider and ensuring that the fees charged to participants were reasonable and not excessive for the services provided. Because Defendant offered the YOUR PPO option that provided the same medical care as the YOUR HSA-Eligible PPO option but at an increased cost to participants, Defendant has failed to ensure that these fees were reasonable and not excessive.

53.    This failure suggests that Defendant employed an imprudent process for managing the Plan's PPO options and the fees charged to participants. Employers commonly offer PPO options to participants in which no single option is financially dominated by another. Doing so was a plausibly available prudent alternative for Defendant.[22] Plaintiffs plausibly allege that, by continuing to offer the YOUR PPO option in light of its dominated nature, Defendant has breached its fiduciary duty of prudence.

---

[22] How Common are Dominated Health Options? Evidence from Employer Health Benefits with High-Deductible Plans, at 30.

54.     Defendant has also failed to inform participants of the dominated nature of the Plan's PPO options. Defendant's Health Program Guide includes a section that informs participants of "How the Health Care Plans Differ." This section identifies only two differences between these options: (1) eligibility for an HSA; and (2) cost-sharing responsibilities. None of these factors either inform participants of the dominated nature of the YOUR PPO option or affect the dominated nature of the YOUR PPO option.

55.     First, the availability of an HSA through the YOUR HSA-Eligible option further contributes to its dominance over the YOUR PPO option. According to the University's website, full-time faculty and staff earning less than $71,000/year and residents and fellows who certify eligibility during Open Enrollment will receive a one-time contribution of $200 (for single coverage) or $400 (for all coverage levels other than single) to their HSA from the University.[23] This contribution amount effectively lowers the out-of-pocket cost for these YOUR HSA-Eligible participants and widens the gap in cost between that option and the YOUR PPO option. While participants enrolled in the YOUR PPO option are eligible for an FSA instead of an HSA, the University does not contribute to the FSA. Moreover, YOUR HSA-Eligible participants may also choose to contribute to an FSA instead of an HSA, if they prefer.

56.     Second, Defendant informs participants that the YOUR PPO option involves "generally higher employee premium contributions" than the YOUR HSA-Eligible option, and that the options have different deductibles and out-of-pocket maximums. The implication is that there are scenarios in which either option could be financially beneficial to an employee depending on their level of anticipated medical care. However, Defendant never informs participants that they

---

[23] https://www.rochester.edu/human-resources/benefits/health-care/health-savings-accounts/

will almost certainly spend more overall in the YOUR PPO option absent an extreme and unlikely scenario.

57.     Defendant also misleads participants by suggesting that there are certain financial benefits to selecting the YOUR PPO option. For example, Defendant identifies that the Your PPO plan offers a program that provides "savings for certain specialty prescription medications" but does not identify what specialty medications this program applies to or what savings could be earned. Further, both the YOUR PPO option and the YOUR HSA-Eligible option allow access to the same prescription drugs. While some participants may be able to pay less for "certain specialty prescription medications" through the YOUR PPO plan, they will still pay more overall due to the dominated nature of the options. Suggesting that participants will save through this program misleads participants about the dominated nature of the Plan's options.

58.     It is no excuse that an extreme scenario ***could*** result in slight savings for a small number of participants choosing the YOUR PPO option. These outlier scenarios apply to a small few, if any, of the over 18,000 Plan participants, and are impossible to anticipate. They provide a slim possibility of slight savings compared to the near-certainty of significant savings in the YOUR HSA-Eligible option. This is not the type of rational financial trade-off that offering a low-deductible and high-deductible option is designed to accomplish.

59.     Offering these options for years without ever correcting the issue or informing participants of the near-certainty that they will be better-off in the YOUR HSA-Eligible option suggests that Defendant employed an imprudent process for managing the Plan. Put differently, Defendant's "unawareness of, or blindess to, this particular anomaly raises a significant question as to whether [Defendant], at the various decision points, [was] as careful as they should have been[.]" *In re Meridian Funds Grp. Sec. & ERISA Litig.*, 917 F.Supp. at 240. Further, by failing

to communicate to Plan participants the material fact that enrolling in the YOUR PPO option results in the highest payroll deduction for premiums and is extremely unlikely to provide any financial benefit over the lower-premium option, Defendant failed to disclose material information in breach of their duties under ERISA.

## CLASS ACTION ALLEGATIONS

60.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to seek the remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary to bring suit for injunctive or other equitable relief. Plaintiffs seek certification of this action as a class action pursuant to these statutory provisions and Fed. R. Civ. P. 23.

61.    Plaintiffs assert their claims against Defendant on behalf of a class of participants and beneficiaries of the Plan defined as follows:[24]

> All employee participants and beneficiaries of the Health Care Plans for Faculty & Staff of the University of Rochester enrolled in the YOUR PPO option at any time on or after September 23, 2019, excluding Defendant, any of its directors, and any officers or employees of Defendant with responsibility for the Plan's administrative functions.

62.    Numerosity:   The Class is so numerous that joinder of all Class members is impracticable. The Plan has thousands of participants.

63.    Typicality:    Plaintiffs' claims are typical of the Class members' claims. Plaintiffs participated in the Plan as employees of the University, enrolled in the YOUR PPO option, and were subject to the same preferred provider organization options as other Class members.

---

[24] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Defendant managed the Plan collectively and treated Plaintiffs consistently with other Class members. Defendant's imprudent actions and omissions affected all class members similarly.

64.    Adequacy:    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

65.    Commonality:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

   a.  Whether Defendant is a fiduciary of the Plan, and the scope of its fiduciary duties;

   b.  Whether Defendant breached its fiduciary duties under 29 U.S.C. § 1104 by engaging in the conduct described herein;

   c.  The proper form of equitable and injunctive relief; and

   d.  The proper measure of monetary relief.

66.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendant would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

67.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief

25

by the Court, such as replacement of the Plan's preferred provider organization options or removal of Plan fiduciaries, would be dispositive of non-party participants' interests.

68.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendant by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Fiduciary Duty**
**Offering a Dominated Option**

69.   Plaintiffs repeat and re-allege Paragraphs 1 through 68 of the Complaint as though fully set forth herein.

70.   Defendant is or was a fiduciary of the Plan under 29 U.S.C. §§ 1002(21).

71.   29 U.S.C. § 1104 imposes fiduciary duties of loyalty and prudence upon Defendant in connection with the administration of the Plan and the selection and monitoring of the Plan's

26

preferred provider organization options, including the fees associated with those options in light of the services provided.

72.     The scope of this fiduciary duty includes managing the Plan solely in the interest of its participants and beneficiaries and with appropriate care, skill, diligence, and prudence. Defendant are directly responsible for ensuring that each PPO option within the Plan is prudent, evaluating and monitoring the Plan's PPO options on an ongoing basis, and remedying imprudent offerings.

73.     Defendant breached its fiduciary duties by offering a menu of preferred provider organization options to Plan participants in which the YOUR PPO option offered no financial or medical benefit to its enrollees when compared to the YOUR HSA-Eligible option. A prudent fiduciary would have monitored how the premiums, deductibles, coinsurance rates, and out-of-pocket maximums of the various PPO options impact the overall cost of those options to ensure that no option was financially dominated by any other option. Defendant failed to take these prudent measures to monitor the Plan's PPO options to ensure that enrollees in the YOUR PPO option paid only reasonable fees in light of the services provided and therefore breached their duty of prudence to the Plan.

74.     Defendant's fiduciary breach resulted in significant losses to the Plan and its participants in the form of excessive payroll deductions and lost wages. Each Defendant is liable for the losses that resulted from these fiduciary breaches, as well as equitable relief and other relief as provided by ERISA. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

## COUNT II
### Breach of Fiduciary Duty
### Failure to Provide Material Facts

75.     Plaintiffs repeat and re-allege Paragraphs 1 through 68 of the Complaint as though fully set forth herein.

76.     Defendant is or was a fiduciary of the Plan under 29 U.S.C. §§ 1002(21). Its fiduciary obligations require the communication of material facts to participants when it is known or should be known that Defendant's silence may be harmful to participants, whether or not the participant asks for this material information.

77.     Defendant breached their fiduciary duty by failing to communicate and disclose to participants that the YOUR PPO option provides no financial benefit to participants in comparison to the YOUR HSA-Eligible option.

78.     Defendant's fiduciary breach resulted in significant losses to the Plan and its participants in the form of excessive healthcare expenses, including through payroll deductions and lost wages. Each Defendant is liable for the losses that resulted from these fiduciary breaches, as well as equitable relief and other relief as provided by ERISA. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A declaration that Defendant has breached its fiduciary duties under ERISA;

D.      An order compelling Defendant to personally make good to the Plan and its participants all losses incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan and participants to their position but for this unlawful conduct;

E.      An order enjoining Defendant from any further violations of its ERISA fiduciary responsibilities, obligations, and duties;

F.      Surcharge and other equitable relief to redress Defendant's illegal practices and to enforce the provisions of ERISA as may be appropriate;

G.      An award of pre-judgment interest;

H.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

I.      An award of such other and further relief as the Court deems equitable and just.

Dated: December 19, 2025

**NICHOLS KASTER, PLLP**
_s/ Brock J. Specht_
Brock J. Specht, MN Bar No. 0388343*
Ben Bauer, MN Bar No. 0398853**
*_admitted to the Western District of New York_
**_admitted proc hac vice_
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
bspecht@nka.com
bbauer@nka.com

**DON BIVENS, PLLC**
Don Bivens, AZ Bar No. 005134*
        *_pro hac vice application forthcoming_
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Telephone: (602) 762-2661

ATTORNEYS FOR PLAINTIFFS